## Commonwealth ex rel. McClintock et al. v. Kelly et al.

*Res judicata — Parties—Privies—Conclusiveness of judgment—Laches—Benevolent associations.*

1. The judgment of a court of concurrent jurisdiction directly on the point is, as a plea, a bar; or, as evidence, conclusive between the same parties on the same matter directly in question in another court.

2. Where, in an equity proceeding, the merits or any facts material to the final determination of the controversy have been considered and passed upon, such matters are as much *res judicata* as they would be by a judgment at law.

3. Where a matter is *res judicata* between the parties to the suit, it is also *res judicata* as to their privies.

4. Privity means a mutual or successive relationship to the same rights of property, and, within the rules relating to the conclusiveness of judgments, all persons are privies to a judgment whose succession to the rights of property thereby adjudicated or affected was derived through or under one or other of the parties to the action and accrued subsequently to the commencement of that suit.

5. It is not material that the privity of one against whom an adjudication is reached does not appear of record in the previous suit.

6. Where, in a suit between the contending factions of a fraternal beneficial association, it is adjudicated that the grand lodge of one of the factions is the legal body, in a subsequent *quo warranto* proceeding the officers of the contending lodges are privies to the judgment entered in the former suit and are bound by it.

7. Where in such a proceeding it appears that the relators are the officers and trustees of the lodge which has been adjudged legal, it is proper to submit to the jury the question of their laches in instituting the proceedings, inasmuch as laches may be imputed to a trustee as well as to a person suing in his own right.

8. And this is the case although the court may be convinced that the relators have not in fact been guilty of laches.

Defendants' motions for a new trial and judgment in their favor *non obstante veredicto.* C. P. Montgomery Co., June T., 1922, No. 149.

*High, Dettra & Swartz* and *Walter L. Sheppard,* for plaintiffs.

*Charles D. McAvoy* and *John M. Patterson,* for defendants.

MILLER, P. J., Jan. 11, 1926.—The Loyal Orange Institution of the United States of America, a secret, benevolent and fraternal order, was, when its

Supreme Grand Lodge held its bi-ennial meeting in 1912 and elected William A. Dunlap its Supreme Grand Master, an harmonious and prosperous organization. Mr. Dunlap, in the following year, arbitrarily and unlawfully, as has been authoritatively held, suspended from membership many of its subordinate lodges and members and thereby caused a breach in the order that has not yet healed. Those so ousted appealed their cause to the Supreme Grand Lodge, which next met in 1914 at Niagara Falls, and, as the hour for its assembling approached, it became apparent that, because of their relative number, they and their adherents would likely control its proceedings. They have ever since been known as the "Kirkland," and Mr. Dunlap and his partisans as the "Lemmon," faction of the order.

The Supreme Grand Lodge was, in 1914, organized and held by the "Kirkland" faction at the time and place appointed in the call, and Mr. Dunlap and his partisans, voluntarily absenting themselves from its meeting, held another at the proper hour, but in a different place. Each faction has ever since that time maintained its organization and the charter of the Supreme Grand Lodge continues in the possession of the "Lemmon" party.

The question of which of the 1914 meetings of the lodge was genuine and which spurious—which regular and which rump—has been agitated ever since, and, in consequence, there has followed a long train of bitter, protracted and expensive litigation which has been carried on in many jurisdictions. This is all set forth in the record and need not be mentioned in detail here. The outstanding fact concerning it is, however, that the "Kirkland" faction has uniformly prevailed.

The Loyal Orange Institution of the United States of America owns and maintains at Hatboro, in this county, a home for the care of its dependents. It was, many years ago, chartered by this court, but its fifteen directors are elected by the Supreme Grand Lodge. Each faction has, since and including 1914, complied with this requirement of the by-laws, and, as a result, each maintains its home organization. The directors representing the "Lemmon" faction were in possession of the home in 1914, and they and their successors have since held that possession to the utter exclusion of the relators and their predecessors in office, notwithstanding that not more than one of their number is a member of a Pennsylvania subordinate lodge, although several of them reside in that state. Concrete evidence of the terrible blight cast on the national institution by the controversy amongst men in it for power and leadership is to be found in the fact that, when the split occurred, the home was caring for from forty-five to seventy and maintaining a private school for education of its orphaned guests, and now the inmates of all classes number but twenty-five and the school has been abandoned.

As stated, there has been much litigation between the factions. The first time it broke out in this jurisdiction was in 1918, when, in a proceeding brought by the "Lemmon" directors to amend the charter of the home, the "Kirkland" board answered promptly and raised directly the question of which meeting of the Grand Lodge in 1914 was legitimate and which illegitimate. This proceeding was thereupon allowed to drag wearily until, upon the remonstrants insisting that it be gone on with or dismissed by the court, it was, on Dec. 21, 1921, formally abandoned.

The remonstrants there, being, for all practical purposes, the relators here, thereupon, on Aug. 3, 1922, filed a suggestion for a *quo warranto* against the petitioners there and, practically, the defendants here, and the matter was so far proceeded with that its issues of fact came on for trial before a jury at the April Term, 1925, and resulted in a verdict for relators. Defendants

then moved for a new trial and judgment in their favor *non obstante veredicto* and the matter was heard at the October argument court. As the transcribed trial record covers 508 pages and defendants have assigned twenty-eight reasons for a new trial, the task of disposing of the motions might, at first glance, impress one as an almost endless undertaking. This impression would be a false one, however, because there are few questions really in controversy. For instance, many of the reasons assigned for the new trial are, and much of defendants' argument was, directed to the question of the standing of the relators, when, as a matter of fact, this question was removed from the controversy by stipulation of counsel noted on the record.

The only questions that arise in the case which require discussion are, as we view it: 1. Which of the two meetings of the Grand Lodge held at Niagara Falls in 1914 was the regular one? 2. Does this court have jurisdiction of the controversy? And 3. Assuming that the meeting held by the "Kirkland" faction was the genuine one and that we have jurisdiction, are the relators to be denied recovery because of their own laches? In a determined effort to keep the length of this opinion within reasonable limits, we shall, therefore, confine it to a consideration of these three questions, making no specific reference to any of the twenty-eight reasons filed. The first two of the three questions propounded were taken away from the jury by the trial judge and the last was submitted to it.

1. That of which of the 1914 meetings was regular and which spurious was so taken away from the jury primarily because of the admission in evidence of the record of the so-called "Baltimore" case. After this pending proceeding had been commenced and before its trial, a suit in equity was begun in, and decided by, the Circuit Court of Baltimore City, Maryland. The complainant in that case was the "Kirkland" faction, Supreme Grand Lodge of the Loyal Orange Institution of the United States of America, and the defendant The State Grand Orange Lodge of Maryland of the Loyal Orange Institution of the United States of America, being the Maryland State Grand Lodge of the "Lemmon" faction. The bill alleged, in part, that defendant had been organized by secessionists from the true order and others who had never been admitted to membership in it, in violation of its organic law, with intent to deceive the public, and prayed for an injunction restraining a continuance of the wrong.

Hugh Wilson was then the Supreme Grand Master and George Lundie the Supreme Grand Secretary of the Supreme Grand Lodge of the "Lemmon" faction. Alleging that the rights of their Supreme Grand Lodge were seriously endangered by the suit, they asked the court, and were allowed, as representatives of their grand lodge, to become parties respondent therein. The joint answer of the original and intervening defendants denying every material allegation in the bill was then filed and the case came on for hearing on the issue thus raised. That issue was plainly and clearly, which of the two contending Grand Lodges was the authentic or legitimate one?

The hearing consumed ten days and, at its end, the chancellor, in an oral opinion, found in favor of the "Kirkland" faction and against both the original defendant and the intervening association, and the court, on Jan. 8, 1924, afterwards so decreed. Was the record of this case properly admitted into the evidence?

The Orange Home belonged in 1914, as it has ever since, to the national order. Those in its management are but the creatures or representatives of the Supreme Grand Lodge, to which they owe allegiance. A stream cannot rise higher than its source. The *personnel* of one-third the board is changed

by the parent lodge every two years. The directors have no personal interest whatever in the institution and, in its management, are but the agents of their Supreme Grand Lodge. Furthermore, Hugh Wilson, the present Supreme Grand Master, and George T. Lemmon, the present Supreme Grand Secretary, of the Supreme Grand Lodge of the "Lemmon" faction were present throughout, and participated actively in, this trial. The same is true of Robert A. Gilmore and William J. Kirkland, who, respectively, now hold the same offices in the Supreme Grand Lodge of the "Kirkland" faction. Technically, the matter on trial here was, by what authority the named defendants claimed to exercise their office? Actually, that inquiry could involve only the legitimacy of the Supreme Grand Lodge, from which they admittedly derived that authority. As the very existence of the agent depends upon the existence of his principal, if the Grand Lodge of those of either side to the controversy were illegitimate, they can derive no authority from it. As relators' counsel correctly say in their brief, "it would appear too plain for argument that the contention raised in this *quo warranto* proceeding is purely a contention between parties claiming the right of agency through principals."

The judgment of a court of concurrent jurisdiction directly upon the point is, of course, as a plea, a bar; or, as evidence, conclusive between the same parties on the same matter directly in question in another court: Hibshman *v.* Dulleban, 4 Watts, 183. Where, in an equity proceeding, the merits, or any facts material to the final determination of the controversy, have been considered and passed upon, such matters are as much *res adjudicata* as they would be by a judgment at law: Moser *v.* Phila., H. & P. R. R. Co., 233 Pa. 259, 270; and the first judgment, when given, whether it be in the action commenced first or last, extinguishes the original cause of action and gives to the plaintiff in lieu thereof one of a higher order: Duffy & Mehaffy *v.* Lytle, 5 Watts, 120.

While, therefore, the Baltimore case was not between the same named parties, as is this proceeding, it, nevertheless, is *res adjudicata* against the defendants here. It certainly would have estopped their Supreme Grand Lodge had it been named as the defendant here. And the decree entered there binds here not only the parties to that suit, but their privies, to which class these defendants clearly belong.

Privity means a mutual or successive relationship to the same rights of property and, within the rules relating to the conclusiveness of judgments, all persons are privies to a judgment whose succession to the rights of property thereby adjudicated or affected was derived through or under one or other of the parties to the action and accrued subsequent to the commencement of that suit. It is not material that the privity of one against whom an adjudication is reached does not appear of record in the previous suit: 34 Corpus Juris, 1010; Strayer *v.* Johnson, 110 Pa. 21, 24. There is no generally prevailing definition of privity which can be automatically applied to all cases. Who are privies requires careful examination into the circumstances of each case as it arises: Old Dominion Copper Mining Co. *v.* Bigelow, 203 Mass. 159, 214.

As there is no privity of estate between a principal and his agent, ordinarily a judgment against the principal is not binding or conclusive on an agent who was not a party to the action, unless he was given notice and an opportunity to defend. However, under some circumstances, a judgment against the principal may be *res adjudicata* as to the agent, as where he is in privity with the principal in respect to the matter in question and can claim rights

Commonwealth ex rel. McClintock et al. v. Kelly et al.

or justify his acts only under the principal: 34 Corpus Juris, 1024; Featherbone Co. v. De Camp et al., 154 Fed. Repr. 198; Hart Steel Co. v. Railroad Sup. Co., 244 U. S. 294.

As stated already, the contest here is not for ownership of the Orange Home, nor even for its possession. The only matter actually in controversy is, by what authority do the named defendants claim to exercise their office? The answer to this query is to be found in another, is the Supreme Grand Lodge of the "Lemmon" faction authentic or legitimate? That is the precise question that was adjudicated in the Baltimore case, and if two actions, although they may involve the right to different things, put in issue a common matter of fact as a necessary ground of recovery, its adjudication in the first suit in conclusive upon the second: 24 Am. & Eng. Ency. of Law, 778; 34 Corpus Juris, 913. Also, see Rauwolf v. Glass, 184 Pa. 237.

In applying the principle of res adjudicata, the inquiry is not always, perhaps, as to the identity of the cause of action, but as to the identity of the matter in issue: Cavanaugh v. Buehler, 120 Pa. 441, 457. And, as our present Chief Justice so aptly says in Havir's Estate, 283 Pa. 292: "This is a rule dictated by public policy which demands that, when a fact has been judicially and finally determined between the same parties, contention with respect thereto must cease. The rule applies with the same strictness where the cause of action, while not technically the same, is, nevertheless, so related to the cause in the prior litigation that some matter, the establishment of which is essential to the recovery in the second, was determined in the first."

It is felt that further consideration of this phase of the case is unnecessary. As to it, defendants are estopped by the decree in the "Baltimore" case. We have not been convinced of error in admitting the record of that case into the evidence. Its admission established the relative legitimacy of the two contending Grand Lodges in favor of the relators, and, of course, took this question from the jury. However, if it had not been admitted, it still would have been the duty of the trial judge, under the evidence, to have instructed the jury to find for relators on this question.

2. So far as the matter of jurisdiction is concerned, little need be said. Under the evidence, generally, there was nothing to sustain a verdict to the effect that the Imperial Grand Orange Council of the World could have taken cognizance of the controversy between the two contending Supreme Grand Lodges, except at the request or with the consent of both, which was never made nor obtained. Hence, it did not do so at its 1923 meeting, and this fact was clearly established by the evidence, both documentary and oral, at the trial. Moreover, this issue also had been adjudicated adversely to defendants in the "Baltimore" case, and, after its record was admitted in evidence, no error was committed in also taking it from the jury. The court had jurisdiction.

3. The instructions as to the first and second issues lightened the labors of the jury considerably. The identity of the relators, their respective terms of office and the regularity of their election and succession were made a matter of stipulation of record. This left for the jury but one question for consideration—the proceedings having been commenced on Aug. 3, 1922, or about eight years after the Niagara Falls meetings—were the plaintiffs to be barred from recovery by their own laches? Whether even this contention should, under the evidence, have been submitted to the jury is a matter of some doubt, but the defendants do not, and could not, complain that such was done. They take exception only to the manner of its submission and the answers of the court to their points relating to it. Much said here is, of necessity, by way of repetition.

DISTRICT AND COUNTY REPORTS. 539

Commonwealth ex rel. McClintock et al. *v.* Kelly et al.

This is not an action against directors for their misuse of corporate property. There, six years' omission to proceed would be a bar. It was stipulated at the trial that defendants and their predecessors, since 1914, had discharged their duties faithfully. Nor is it really, in substance at least, the ordinary case of a contest between warring boards of directors at all. The Orange Home is a corporation of exceptional character. It is the property and creature of the national order and was chartered locally only to facilitate its convenient management. Its managers or directors derive their authority from the Supreme Grand Lodge. They are elected bi-ennially for terms of six years in groups of five. They are mere agents or representatives of the lodge and, as such, virtually trustees of the institution, the charitable purpose of the existence of which is clearly set forth in its charter.

Its directors have, and can have, no personal or individual interest in it. It is difficult, therefore, to see how defendants could have been prejudiced by the delay of relators in commencing proceedings. A change in conditions prejudicial to defendants is, of course, of the very essence of a defence by them on the ground of laches (Montgomery *v.* Montgomery, 269 Pa. 332), and the absence of such injury to them is fatal to it.

As laches may be imputed to a trustee as well as to a person suing in his own right (Seybert *v.* Robinson, 13 Pa. C. C. Reps. 198), it was deemed advisable, however, to submit this issue to the jury, and the same was done with instructions which, under all the evidence, seem, upon careful review, to have been fair. They cover eleven pages of the charge and the jury was expressly told that the question of laches does not depend, as does the statute of limitations, upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, plaintiff is chargeable with want of due diligence in failing to institute or prosecute his proceeding: Kinter *v.* Commonwealth Trust Co., 274 Pa. 436, 443. The attention of the jury was carefully and at length directed to the evidence bearing relation to this issue, and we have not been convinced of substantial error in this connection.

The case was patiently, painstakingly and conscientiously tried; it is felt that the verdict was right under the evidence, and it is a comforting thought that the result here was consistent in principle with that of every case which has resulted from the unfortunate split in this once powerful and truly beneficent order. Many of these cases have reached the highest appellate courts of the jurisdictions in which they were brought. The last of these was decided in Detroit so recently as Dec. 18, 1925. In all, the "Kirkland" faction has prevailed.

The indirect result of all this litigation and the bitterness that it has engendered cannot be other than harmful to the Orange Order. The attitude of some of those actively connected with it has not appeared to be in keeping with the lofty principles and purposes of the institution. Following the precedent set by our Superior Court, as remarked by the Supreme Court, we venture to express the hope that this decision may help to bring the parties to a better understanding. May they be made to realize that, as support of the law and the maintenance of its supremacy are amongst the expressed and highly commendable purposes of the institution, it ill becomes those who claim to be its loyal members and true representatives to chafe under the limitations of the law and to refuse to become reconciled to prevailing authority.

And now, Jan. 11, 1926, the motions for a new trial and judgment for defendants *non obstante veredicto* are both overruled; a new trial is refused; all the reasons assigned therefor are dismissed; the prothonotary is directed

Commonwealth ex rel. McClintock et al. *v.* Kelly et al.

to enter judgment on the verdict of the jury in favor of the plaintiffs and against the defendants on payment of the verdict fee; and an exception is granted to defendants to our action in overruling their motion for judgment *n. o. v.*

From Aaron S. Swartz, Jr., Norristown, Pa.